### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

TODD E. DUNN,                                    Case No. 1:15-cv-176

             Plaintiff,                         Barrett, J.
                                                 Bowman, M.J.
   v.


COMMISSIONER OF SOCIAL SECURITY,

             Defendant.


### REPORT AND RECOMMENDATION

Plaintiff Todd Dunn filed this Social Security appeal in order to challenge the Defendant's determination that he was not disabled between November 1, 2009 and December 5, 2011. *See* 42 U.S.C. §405(g). Proceeding through counsel, Plaintiff presents four claims of error for this Court's review. As explained below, I conclude that the ALJ's finding of non-disability should be AFFIRMED.

### I. Summary of Administrative Record

On March 24, 2010, Plaintiff filed applications for Disability Insurance Benefits ("DIB") and for Supplemental Security Income ("SSI"). Plaintiff was insured for purposes of DIB only through September 30, 2011, and therefore must establish the onset of disability prior to that date to qualify for DIB benefits. (Tr. 131). In his applications, Plaintiff alleges a disability onset date of November 1, 2009 due to "multiple broken bones, pins in feet, unable to read [and] write." (Tr. 341).

After Plaintiff's applications were denied initially and upon reconsideration, Plaintiff requested a video hearing before an Administrative Law Judge ("ALJ"). On

1

February 7, 2012, a hearing was held before ALJ John S. Pope. (Tr. 35-87). Plaintiff appeared in Portsmouth, Ohio along with counsel and an impartial vocational expert ("VE") to testify by videoconference before ALJ Pope, who presided from Chicago, Illinois. A month after his hearing but before the ALJ's decision, Plaintiff underwent knee surgery. On April 26, 2012, ALJ Pope issued a decision, concluding that Plaintiff was not disabled. (Tr. 131-146).

The Appeals Council vacated ALJ Pope's decision and remanded on May 8, 2013, based upon evidence "that the claimant was receiving treatment for a meniscal tear and that the claimant underwent an arthroscopic procedure on his left knee on March 14, 2012." The Appeals Council found that surgery to be "material" and remanded for "further evaluation…to determine the ongoing severity and effects of the knee impairment." (Tr. 153).

Plaintiff submitted additional medical evidence, (Tr. 857-1476), which was considered on remand by newly assigned ALJ Peter J. Boylan. On September 27, 2013, a new video hearing was conducted by ALJ Boylan, who presided from Cincinnati, Ohio. (Tr. 88-123). Plaintiff again appeared with counsel from Portsmouth, Ohio, and both Plaintiff and a vocational expert testified. (Tr. 92-120). On October 23, 2013, ALJ Boylan issued a partially favorable decision, finding that Plaintiff had become disabled on December 5, 2011, entitling him to SSI benefits, but was not disabled prior to that date. (Tr. 18, 22-24, 26). The Appeals Council denied Plaintiff's request for further review; therefore, ALJ Boylan's decision remains as the final decision of the Commissioner. In this judicial appeal, Plaintiff urges reversal of the ALJ's determination that Plaintiff was not disabled for an additional two-year period between November 1, 2009, and December 2011, which would entitle him to DIB as well as SSI benefits.

2

On November 1, 2009, Plaintiff was still defined as a younger individual (age 18-49), and he remained a younger individual through the period now at issue. However, Plaintiff turned 50 on April 7, 2012, and therefore changed age groups to the "closely approaching advanced age" group at the time of ALJ Boylan's decision. Plaintiff has a limited education, having dropped out of school in the ninth grade, and his sole relevant past work was as a "repo man" or tow truck operator. (Tr. 93-94). There is no dispute that Plaintiff can no longer perform his prior work.

For the two-year period at issue in this appeal, the ALJ determined that Plaintiff had the following severe impairments: "fibromyalgia; bilateral carpal tunnel syndrome; obesity; adjustment disorder with depression; and borderline intellectual functioning." (Tr. 18). Those impairments continued throughout the claimed period of disability. However, beginning on December 5, 2011, the ALJ found that Plaintiff had developed multiple additional impairments, all of which were severe, which led to the disability determination. Specifically, the ALJ found that Plaintiff had developed the following additional physical impairments: "status post surgical repair of a left knee meniscal tear; status post surgical repair of a left rotator cuff tear; degenerative disc disease of the lumbar and cervical spine; a fractured sesmoid and osteochondral defect of the left foot; polycythemia secondary to hypoxia from obstructive sleep apnea; and asthma." (Tr. 18).

As ALJ Pope had in his earlier decision, ALJ Boylan determined that Plaintiff did not meet or equal any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1, such that Plaintiff was entitled to a presumption of disability. (Tr. 18). From November 1, 2009 until December 5, 2011, ALJ Boylan determined that Plaintiff retained residual functional capacity ("RFC") to perform light work with the following restrictions:

> [T]he claimant was functionally illiterate. The claimant was limited to simple, routine, repetitive tasks. The claimant was not able to perform at a

> production rate pace, such as generally associated with assembly line work, but the claimant was capable of performing goal-oriented work, such as generally associated with jobs like an office cleaner. The claimant was limited to simple, work-related decisions. The claimant was limited to occasional interact[ion] with supervisors, coworkers, and the public, with all such action on a superficial basis. The claimant was additionally limited to tolerating occasional changes in a routine work setting.

(Tr. 18).  Based on the testimony of the vocational expert, ALJ Boylan determined that although Plaintiff could not return to his past work, he still could perform jobs that exist in significant numbers in the national economy, including the representative occupations of hand packer, inspector, and folder/stacker. (Tr. 25).

As of December 5, 2011, however, the ALJ determined that Plaintiff's RFC had been further reduced from light work to a restricted range of sedentary work as follows:

> [T]he claimant is able to lift no more than 20 pounds occasionally, lift no more than 10 pounds frequently, and carry no more than 10 pounds occasionally. The claimant is able to stand no more than 15 minutes at a time and walk no more than 5 minutes at a time. Although the claimant requires the use of a cane while walking more than 25 feet, he may carry small objects while doing so. The claimant is additionally limited to no more than occasional use of bilateral foot controls. The claimant is additionally limited to no more than occasional climbing, balancing, stopping, kneeling, crouching, and crawling. The claimant must also avoid concentrated exposure to temperature extremes, vibrations, workplace hazards, and pulmonary irritants, such as fumes, odors, dusts, gases, and poor ventilation.

(Tr. 22-23).   Due to the reduction in Plaintiff's RFC, there were no longer any jobs that Plaintiff could perform. (Tr. 26).  In addition, the reduction to sedentary work combined with Plaintiff's limited education and age category entitled Plaintiff to the benefit of Grid Rule 201.10, directing a finding of "disabled."  (*Id.*)

In his Statement of Errors, Plaintiff argues that the ALJs erred by: (1) unreasonably evaluating Plaintiff's moderate limitations as to concentration, persistence, or pace; (2) failing to give controlling weight to the opinions of Dr. Arrick;

4

(3) improperly assessing Plaintiff's credibility; and (4) improperly determining that his disability did not begin until December 5, 2011.

## II. Analysis

### A. Judicial Standard of Review

To be eligible for benefits, a claimant must be under a "disability." *See* 42 U.S.C. §1382c(a).  Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies.  *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

When a court is asked to review the Commissioner's denial of benefits, the court's first inquiry is to determine whether the ALJ's non-disability finding is supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (additional citation and internal quotation omitted).  In conducting this review, the court should consider the record as a whole.  *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978).  If substantial evidence supports the ALJ's denial of benefits, then that finding must be affirmed, even if substantial evidence also exists in the record to support a finding of disability.  *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).  As the Sixth Circuit has explained:

> The Secretary's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion.... The substantial evidence standard presupposes that there is a 'zone of choice' within which the Secretary may proceed without interference from the courts.  If the Secretary's decision is supported by substantial evidence, a reviewing court must affirm.

*Id.* (citations omitted).

5

In considering an application for supplemental security income or for disability benefits, the Social Security Agency is guided by the following sequential benefits analysis: at Step 1, the Commissioner asks if the claimant is still performing substantial gainful activity; at Step 2, the Commissioner determines if one or more of the claimant's impairments are "severe;" at Step 3, the Commissioner analyzes whether the claimant's impairments, singly or in combination, meet or equal a Listing in the Listing of Impairments; at Step 4, the Commissioner determines whether or not the claimant can still perform his or her past relevant work; and finally, at Step 5, if it is established that claimant can no longer perform his or her past relevant work, the burden of proof shifts to the agency to determine whether a significant number of other jobs which the claimant can perform exist in the national economy.  *See Combs v.  Commissioner of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006); 20 C.F.R. §§404.1520, 416.920.

A plaintiff bears the ultimate burden to prove by sufficient evidence that he is entitled to disability benefits.  20 C.F.R. § 404.1512(a).  A claimant seeking benefits must present sufficient evidence to show that, during the relevant time period, he suffered an impairment, or combination of impairments, expected to last at least twelve months, that left him unable to perform any job.  42 U.S.C. § 423(d)(1)(A).

**B.  Specific Errors**

**1.  Plaintiff's Limitations on Concentration, Persistence, or Pace**

Plaintiff first argues that ALJ Boylan erred in adopting the mental RFC previously determined by ALJ Pope, and by failing to include additional limitations concerning concentration, persistence or pace, or "allowance for withstanding the stress and pressure associated with day-to-day work activity."  (Doc. 16 at 6).  ALJ Boylan noted that Plaintiff has never sought or received any mental health treatment, (Tr. 19), and

that mental status exams since December 2011 "have shown the claimant has normal mood, affect, memory, concentration, fund of knowledge, judgment, insight, communication ability, voice quality, and articulation of speech." (Tr. 22, n. 6). The ALJ further explained the rationale for adopting the prior mental RFC as follows:

> In regards to the claimant's psychological impairments, there is no new psychological evidence that would disturb Judge Pope's prior analysis of the available mental health issues. The claimant has not undergone any new psychological or psychiatric treatment and various mental status examinations since the claimant's established onset date do not document any worsening psychological symptoms. The undersigned has accordingly adopted Judge Pope's analysis of the evidence related to the claimant's psychological impairments and the mental health opinions.... Then relying on the assessment provided by Dr. Albert Virgil, which received great weight in Judge Pope's analysis, the undersigned provided for more precise mental limitations to further delineate the claimant's psychological limitations. These more precise limitations are consistent with those limitations identified in Judge Pope's decision and the claimant's areas of moderate limitations as noted by Dr. Virgil (i.e., cooperating with others in a work setting; understanding, remembering, and following instructions; maintaining concentration, attention, persistence, and pace, and withstanding the stress and pressure associated with day-to-day work activity).

(Tr. 22).

Both ALJ Pope and, by extension, ALJ Boylan, relied upon and gave great weight to the psychiatric consultative examiner, Albert Virgil, Ph.D., and to state agency psychiatric consultants Roseann Umana, Ph.D., and Mel Zwissler, Ph.D. (Tr. 464-68, 481-98, 539). Dr. Virgil opined that Plaintiff was able to understand, remember, and follow simple and some multi-step repetitive tasks, that he had moderate limitations in his ability to withstand the stress and pressure of work, and moderate limitations in his ability to maintain attention, concentration, persistence, and pace. (Tr. 467-468). Dr. Umana found that Plaintiff had moderate limitations in both the areas of social functioning and in maintaining concentration, persistence or pace. (Tr. 491, 495-497). She opined that Plaintiff could perform simple repetitive and entry level tasks so long as

the environment did not require high production quotas. (Tr. 497). Dr. Zwissler agreed. (Tr. 539).

It is Plaintiff's burden to show that he needed more restrictive mental limitations. *See* 20 C.F.R. § 404.1512; *Jones v. Com'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). To satisfy that burden, Plaintiff relies chiefly on *Ealy v. Com' of Soc. Sec.*, 594 F.3d 504, 517 (6th Cir. 2010), a case in which the Sixth Circuit reversed on grounds that an ALJ failed to properly accommodate moderate limitations in concentration, persistence, or pace.

In *Ealy*, the ALJ used a "streamlined" hypothetical that omitted without discussion a consulting physician's very specific hourly restrictions on pace. However, numerous post-*Ealy* decisions have affirmed in cases in which the ALJ has addressed a moderate impairment in concentration, persistence, and pace by including a limitation to "simple repetitive tasks," clearly rejecting any bright line rule that such limitations are always inadequate. *See, e.g., Hicks v. Com'r*, Civil Case No. 1:13-cv-425-SJD, 2014 WL 4748356 at *6 (R&R adopted Sept. 23, 2014); *Suesz v. Com'r*, 2014 WL 4162555 at *6 (R&R adopted Aug. 20, 2014). *Clayton v. Astrue*, 2013 WL 427407 at *7 (S.D. Ohio Feb. 1, 2013) (collecting cases).[1]

In contrast to *Ealy*, in this case the ALJ did more than limit Plaintiff to "simple, routine, repetitive tasks." (Tr. 18). The ALJ specifically included pace limitations by stating that Plaintiff could not work "at a production rate pace, such as [at work] generally associated with assembly line work." (*Id.*) Thus, the ALJ limited Plaintiff to "goal-oriented work" that required only "simple, work-related decisions" and only

---

[1]Although Plaintiff attempts to distinguish other post-*Ealy* cases in his reply memorandum, the undersigned does not agree that the minor factual differences relied upon by Plaintiff provide grounds for legal distinctions on the record presented.

"occasional interact[ion] with supervisors, coworkers, and the public, with all such action on a superficial basis."  Last, to accommodate moderate limitations in Plaintiff's ability to withstand work stress, the ALJ limited Plaintiff to only "occasional changes in a routine work setting."  (Tr. 18).   Plaintiff fails to offer any explanation as to why the mental limitations included by the ALJ were insufficient to accommodate his moderate limitations in concentration, persistence and pace.  *Accord Smith-Johnson v. Com'r of Soc. Sec.*, 579 Fed. Appx. 426, 437 (6th Cir. 2014).

In his reply memorandum, Plaintiff refers to the opinion of Joseph Carver, Ph.D., a psychological consultant who evaluated Plaintiff on July 22, 2010 for the Scioto County Department of Job and Family Services.  Dr. Carver diagnosed Plaintiff with major depression and anxiety, and opined that Plaintiff met or equaled Listings 12.04 or 12.06 based upon the severity of his mood disorder.  (Doc. 22 at 4-5, citing Tr. 516-517).   To the extent that Plaintiff is attempting to present a new Step 3 claim of error in his reply memorandum (that Plaintiff met a listing), or alternatively, a new claim that the ALJ improperly evaluated this opinion evidence,[2] this Court should not consider it.  In the alternative, the undersigned finds no error in ALJ Boylan's adoption of ALJ Pope's analysis of Dr. Carver's opinion, which was not supported by any explanation whatsoever.  (*See* Tr. 144).

### 2.  Weight Given to Plaintiff's Treating Physician

Plaintiff claims that ALJ Boylan committed a second reversible error when he failed to give controlling weight to the opinions of Ronald Arrick, M.D., Plaintiff's primary care physician.  Records reflect that Plaintiff made an appointment with Dr. Arrick on

---

[2]Plaintiff's discussion of Dr. Carver's opinion is extremely brief, leading to some ambiguity as to the nature of his argument.

July 28, 2010, but Dr. Arrick noted that it had been more than two years since Plaintiff's last visit. (Tr. 138).  On the basis of Plaintiff's complaints of generalized musculoskeletal pain with some tingling in the hands, Dr. Arrick referred Plaintiff to Dr. Welsh; he also referred Plaintiff to an ENT.  Aside from the referrals to specialists, "[n]o physical examination was noted during this visit."  (Tr. 138).

At a follow-up visit in August 2010, Dr. Arrick reviewed Plaintiff's lab, EMG study, and consultation reports, but again there is no record of any physical examination. (*Id*.)  At a follow-up visit on September 26, 2011, Dr. Arrick recorded brief examination notes. (Tr. 140).  Correspondence dated October 28, 2011 by Dr. Arrick states that Plaintiff has a history of "longstanding fibromyalgia," which was then being treated with medication prescribed by Dr. Welsh with "excellent results." (Tr. 141, citing Tr. 778).  Plaintiff also reported a "dramatically positive response" after starting hormone therapy for low testosterone levels.  Dr. Arrick concluded that Plaintiff's chronic fatigue and pain were both "much improved."  (*Id*).   Despite that glowing clinical report, on January 24, 2012, Dr. Arrick submitted an RFC form that opined that Plaintiff had such severe functional limitations that he was precluded from all work.

Specifically, Dr. Arrick opined that Plaintiff could only lift/carry up to ten pounds, could sit for no more than four hours in an eight-hour day, could stand for no more than 15 minutes at a time and one hour total in a workday, and walk for only 10 minutes at a time, or up to 30 minutes in an eight-hour day.  (Tr. 832-841).  Dr. Arrick stated Plaintiff requires a cane to ambulate, can never push/pull bilaterally, and can only occasionally reach, handle, finger, and feel bilaterally.  Dr. Arrick opined that Plaintiff was limited to only occasional use of foot controls with his right foot, and never with his left foot, only occasional climbing of ramps and stairs and no climbing of ladders, ropes or scaffolds,

He further stated that Plaintiff cannot balance, stoop, kneel, crouch, or crawl, can never climb unprotected heights, move mechanical parts, be exposed to extreme cold or vibrations, and can have only occasional exposure to motor vehicles, humidity, wetness, pulmonary irritants, and extreme heat. (Tr. 141, citing Tr. 832-841).

The relevant regulation regarding treating physicians provides: "If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight." 20 C.F.R. §404.1527(c)(2); *see also Warner v. Com'r of Soc. Sec.,* 375 F.3d 387, 390 (6th Cir. 2004); SSR 96-2p. The Commissioner is required to provide "good reasons" if the Commissioner does not give controlling weight to the opinion of a treating physician. *Id.*

ALJ Pope completely rejected Dr. Arrick's January 2012 opinions, finding them entitled to "no weight" for the following reasons:

> Dr. Arrick's treatment notes indicate that he did not see the claimant between May 2008 and July 2010…. There is no evidence in the record that Dr. Arrick has ever performed a physical examination on the claimant other than checking the claimant's lab reports. Therefore, Dr. Arrick's opinion appears to be based primarily on the claimant's subjective reports, rather than objective evidence. This is especially apparent because the opinion is not consistent with the objective findings of the claimant's other treating source, Dr. Welsh.

(Tr. 141). Considering that Plaintiff alleges his disability began in November 2009, the fact that he had no appointments with Dr. Arrick between that date and July 2010, and the further evidence that Dr. Arrick appears to have conducted no physical examinations (other than in September 2011, which as discussed below did not support his opinions), the record contains ample evidence to support ALJ Pope's decision to reject Dr. Arrick's opinions as completely unsupported.

11

ALJ Pope pointed out that Dr. Arrick could not have relied on a February 2012 note from Dr. Welsh that referenced an antalgic gait, because that note was dated "two weeks after Dr. Arrick submitted his forms." (Tr. 142).[3] In addition, "[t]he last treatment note from Dr. Arrick dated October 28, 2011, indicated the claimant's pain and fatigue symptoms were much improve[ed] with medication and treatment." (*Id.*) ALJ Pope discussed possible reasons for bias from Dr. Arrick. While acknowledging that "it is difficult to confirm the presence of such [biases], they are more likely in situations where the opinion in question departs substantially from the rest of the evidence of record, as in the current case." (Tr. 142).

On remand from the Appeals Council, ALJ Boylan reviewed relevant new medical evidence, which included a new RFC opinion offered by Dr. Arrick.

> On September 24, 2013, Dr. Arrick checked a box on a form composed by the claimant's attorney in order to indicate that the limitations he previously identified on January 24, 2012, also applied to September 30, 2011[4].… Dr. Arrick identified no new information that would disturb Judge Pope's analysis of Dr. Arrick's previous opinions and the undersigned accordingly incorporates this discussion by Judge Pope. The undersigned additionally notes that all of Dr. Arrick's clinical exam findings have been "benign" and unremarkable both prior to his prior medical source statements and since the established onset date [of December 2011].… This just further demonstrates the severe disconnect between the severe limitations previously identified by Dr. Arrick and the objective evidence available throughout the record, including the findings from every single clinical examination by Dr. Arrick himself.

(Tr. 22, citing Tr. 1475, emphasis added). Thus, ALJ Boylan's analysis corrects the minor misstatement of ALJ Pope (that no exams were conducted) by specifically referencing Dr. Arrick's own examination findings.

---

[3]As the ALJ noted, earlier records included references to a normal gait. (Tr. 141, *e.g.* Tr. 520, 521, 732, 738).
[4]The undersigned assumes that this opinion was submitted in an attempt to prove eligibility for DIB prior to the expiration of Plaintiff's insured status on September 30, 2011.

The only record of any physical examination ever conducted by Dr. Arrick is dated September 2011.  Treatment notes from that date state: "Examination benign and documented."  (Tr. 780).  The same notes indicate Dr. Arrick's intention to prescribe Lortab for chronic pain since Plaintiff "has taken these in the past…with good results."  (Tr. 780).  In clinical notes dated October 2011, Dr. Arrick states that Plaintiff's fatigue and pain symptoms are "much improved."  (Tr. 778).  Thus, the ALJ reasonably rejected Dr. Arrick's RFC opinions involving extreme physical limitations, including an inability to stand for more than 15 minutes at a time, as not well supported and as inconsistent with substantial evidence in the record as a whole including Dr. Arrick's own clinical records. *Accord Price v. Com'r of Soc. Sec.*, 342 Fed. Appx. 172, 176 (6th Cir. 2009)(affirming rejection of treating physician who failed to identify objective medical findings to support his opinion); *Durio v. Com'r of Soc. Sec.,* 82 F.3d 417 at *2 (6th Cir. 1996) (treating source report not entitled to deference where it "appears to be a characterization of the plaintiff's complaints, rather than the results of any independent medical evaluation").

Plaintiff argues that Dr. Arrick's diagnosis of fibromyalgia ("FM") in and of itself supports the extreme limitations that Dr. Arrick endorsed.  Plaintiff complains that ALJ Boylan was overly focused on "objective" evidence, because FM often is characterized by a distinct lack of significant <u>objective</u> findings that can verify the pain or other symptoms that can result from that disease.

The undersigned is not persuaded that either ALJ committed reversible error in this case.  Dr. Arrick's records reflect no appointments for more than two years prior to July 28, 2010, a date long after Plaintiff's alleged disability onset date of November 1, 2009.  During the two year period at issue in this appeal, Dr. Arrick conducted only one examination, in September 2011.  Plaintiff claims to be disabled by pain from his

fibromyalgia and other ailments.  However, Dr. Arrick's records are strikingly devoid of even <u>subjective</u> complaints by Plaintiff that would support the extreme functional limitations endorsed by Dr. Arrick.  In stark contrast to his RFC opinions, Dr. Arrick's records reflect "benign" findings, and that Plaintiff has obtained "excellent result[s]" with medication prescribed for his fibromyalgia.  (Tr. 778).  On October 28, 2011, Dr. Arrick noted that prescribed hormone therapy produced a "dramatically positive response" in treating Plaintiff's ongoing fatigue. (*Id.*)  In correspondence of the same date, Dr. Arrick recommended continued medical management in light of Plaintiff's "<u>excellent response</u> and [report] he feels better than he has in sometime [sic]," with "chronic fatigue and chronic pain…<u>much improved</u>." (*Id.*, emphasis added)  Dr. Arrick's opinions also are not supported by other substantial evidence of record.  Like Dr. Arrick's notes, Dr. Welsh's November 15, 2010 letter reports that Plaintiff "is feeling better," and that "the Savella is helping him."  (Tr. 753).  Dr. Welsh's November 2010 report builds on a similar report dated October 15, 2010 report, that states that treatment is "helping."  (Tr. 755).[5]

Plaintiff relies upon *Swaim v. Com'r of Soc. Sec.*, 297 F.Supp.2d 986, 990-993 (N.D. Ohio 2003) and *Rogers v. Com'r of Soc. Sec.*, 486 F.3d 234, 245 (6th Cir. 2007), cases in which courts found it error for an ALJ to fail to give controlling weight to the opinion of a claimant's treating physician concerning pain limitations caused by fibromyalgia.  However, *Swaim* stands only for the proposition that the analysis of the severity of a fibromyalgia sufferer's pain is "difficult," and "places a premium…on the

---

[5]Dr. Welsh states that he prescribed a cane at this visit at Plaintiff's request, apparently due to Plaintiff's report of a new pain in his left foot.  (Tr. 755).  ALJ Pope misstated the record when he stated that Dr. Welsh did not indicate that a cane had been prescribed.  (Tr. 141).  In the context of the record as a whole, the undersigned finds this error to have been harmless.

assessment of the claimant's credibility." *Id.* at 990.  Neither *Swaim* nor *Rogers* suggest that ALJs must forego that analysis and accept the plaintiff's allegations of a disabling level of pain without critical review.  To the contrary, *Swaim* states that "[a]lthough the treating physician's assessment can provide substantial input into this credibility determination, ultimately, the ALJ must decide…if the claimant's pain is so severe as to impose limitations rendering [him] disabled." *Id.*

A review of fibromyalgia cases within the Sixth Circuit reflects growing understanding of FM over time by both the Social Security Administration and the courts.  In many earlier cases, remand was required due to a failure by the presiding ALJ to recognize the validity of the diagnosis, or that FM could produce disabling limitations despite the lack of significant objective abnormalities.  In addition to the development of case law, on July 25, 2012, the Social Security Administration published SSR 12-2p in order to provide additional guidance in the evaluation of FM.  *Id.*, 2012 WL 3104869.  As SSR 12-2p states, "FM is a common syndrome." *Id.*  In fact, most people with fibromyalgia suffer less than disabling limitations.  *See Vance v. Com'r of Soc. Sec.*, 260 Fed. Appx. 801, 806 (6th Cir. 2008).

Contrary to Plaintiff's position, objective evidence is not irrelevant when a claimant claims disability as a result of FM.  SSR 12-2p states that "we must ensure there is sufficient <u>objective evidence</u> to support a finding that the person's impairment(s) so limits the person's functional abilities that it precludes him or her from perform any substantial gainful activity." *Id.* at *2 (emphasis added).  It is only the type of "objective evidence" that may vary.  Evidence from the treating physician must document "a physical exam" as well as medical history, and treatment notes must reflect "whether the person's symptoms have improved, worsened, or remained stable over time, and

15

establish the physician's assessment over time of the person's physical strength and functional abilities." *Id.*  To support the FM diagnosis, the evidence should include a record of a physician's digital palpation of tender points, testing to rule out other disorders, or (if 11 of 18 tender points are not documented), repeated manifestations of at least six FM symptoms or co-occurring conditions, "especially …fatigue, cognitive or memory problems…, waking unrefreshed, depression, anxiety disorder, or irritable bowel syndrome." *Id.* at *3 (internal footnotes omitted).

Once FM has been diagnosed, SSR 12-2p reiterates that "[a]s in all claims for disability benefits, we need <u>objective medical evidence</u> to establish" disability.  *Id.* at *3 (emphasis added). In FM cases, "longitudinal records reflecting ongoing medical evaluation and treatment from acceptable medical sources are especially helpful in establishing both the existence and severity of the impairment."  *Id.* (emphasis added). In addition, "[i]f objective medical evidence does not substantiate the person's statements about the intensity, persistence, and functionally limiting effects of [FM] symptoms, we consider all of the evidence in the case record, including the person's daily activities, medications or other treatments the person uses, or has used, to alleviate symptoms; the nature and frequency of the person's attempts to obtain medical treatment for symptoms; and statements by other people about the person's symptoms." *Id* at *5.  As the court pointed out in *Swaim*, a finding concerning credibility often is critical to discern the FM patient's functional abilities.

None of the cases cited by Plaintiff support remand on the record presented.   In *Swaim*, unlike in this case, the treating physician was a specialist in the diagnosis and treatment of fibromyalgia.  Unlike here, where Dr. Arrick's notes reflect only one exam (with no findings to support FM or any limitations) and dramatic improvement with

16

treatment, the *Swaim* specialist documented 18 of 18 trigger points and "continuously" treated the plaintiff for FM with physical therapy, medication, and B-12 injections. Reversal in *Swaim* was required in part because the ALJ rejected the provider's opinion without any discussion of his clinical documentation of trigger points.

Similarly, *Rogers* involved a physician who treated the plaintiff for her fibromyalgia and rheumatoid arthritis every six weeks over a long period of time, with documentation of multiple prescriptions, and recorded observations of swelling, tenderness to palpitation, decreased range of motion on clinical exam, and abnormal lab results. Plaintiff was referred to a specialist for additional treatment of her FM, who documented "classic fibromyalgia distribution" of trigger points, as well as severe pain and swelling. Several other examining physicians also noted the plaintiff's severe pain, including apparent stiffness, notwithstanding other normal findings. In *Rogers,* as in *Swaim* and other early cases involving FM, the ALJ's decision seemed to reflect "hesitancy in identifying this accepted medical condition as a severe impairment, and this hesitancy, in turn, influenced the ALJ's weighing of the treating physician evidence." *Id.* at 243. The ALJ in *Rogers* failed to discuss the tender points standard, and did not recognize consistent documentation (more than 500 pages) of "continuous and frequent" treatment by two treating physicians of "ongoing complaints of intense pain and stiffness throughout Rogers' body as well as fatigue." *Id.* at 244; *see also Lawson v, Astrue*, 695 F. Supp.2d 729 (S.D. Ohio 2010) (noting that multiple treating physicians with lengthy treatment relationships universally agreed that plaintiff was severely restricted by her fibromyalgia, in opinions well-supported by extensive treatment notes, observations during multiple exams documenting severe pain, trigger points, fatigue,

muscle weakness and lab tests reflected elevated ANA and rheumatoid factor consistent with fibromyalgia).

In short, the cases on which Plaintiff relies are easily distinguishable. Substantial evidence in the record[6] (as well as SSR 12-2p and more relevant case law) all support the ALJ's decision to give Dr. Arrick's RFC opinions "no weight" in determining Plaintiff's physical limitations. *See generally, Cunningham v. Com'r of Soc. Sec.*, 2015 WL 4514540 (S.D. Ohio July 24, 2015) (rejecting asserted error regarding ALJ's failure to include additional limitations relating to fibromyalgia); *Myers v. Com'r of Soc. Sec.*, 2015 WL 4651240 (S.D. Ohio July 15, 2015), adopted 2015 WL 4653137 (August 5, 2015) (affirming rejection of treating physician's extreme functional limitations, despite evidence of disease similar to fibromyalgia); *Griffin v. Com'r of Soc. Sec.*, 2014 WL 244109 (S.D. Ohio May 30, 2014) (rejecting greater functional limitations despite severe fibromyalgia).

### 3. Credibility Assessment

Plaintiff next argues that the ALJ committed reversible error in negatively assessing Plaintiff's credibility prior to December 5, 2011.[7] An ALJ's credibility assessment must be supported by substantial evidence, but "an ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Walters v. Com'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997).

---

[6]Plaintiff briefly argues that this Court should reverse because the ALJ did not sufficiently discuss the length of the treating relationship or frequency of examination. (*See* Doc. 22 at 11). However, ALJ Pope did allude to the long gap in treatment as well as several other factors including the inconsistency of Dr. Arrick's opinions with his own clinical records and with the record as a whole. There is no legal requirement for an ALJ to discuss every factor he has considered.

[7]Beginning in December 2011, the ALJ found Plaintiff's allegations to be "generally credible" based upon the fact that the medical records indicated multiple new impairments, all of which were severe.

Further, a credibility determination cannot be disturbed "absent a compelling reason." *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001).  Thus, it is proper for an ALJ to discount the claimant's testimony where there are contradictions among the medical records, his testimony, and other evidence.  *Warner v. Com'r of Soc. Sec.*, 375 F.3d at 387, 392 (6th Cir. 2004).  Both ALJs made adverse credibility findings in this case.

ALJ Pope explained his assessment of Plaintiff as "not credible" as follows:

> Although the claimant testified that he does not currently perform any daily activities, the evidence reveals that it is because he does not want to, and not because of his allegedly disabling impairments.  A review of the claimant's work history shows that the claimant worked only sporadically prior to the alleged disability onset date, which raises a question as to whether the claimant's continuing unemployment is actually due to medical impairments.  The claimant's earning record reveals that he only earned SGA [substantial gainful activity] for the year in ten of the thirty years prior to his alleged onset date, and he had six years where he had no reported earnings.  The claimant reported in his disability application that he was "laid off" from his job….  Furthermore, it appears that the majority of the claimant's allegedly disabling impairments have existed throughout his entire adult life.  The fact that the claimant's impairments did not prevent him from working prior to his alleged onset date strongly suggests that it would not currently prevent work.  While claimant has been prescribed and has taken appropriate medications for the alleged impairments, which weighs in the claimant's favor, the medical records reveal that the medications have been relatively effective in controlling the claimant's symptoms.  Additionally, the claimant did undergo [carpal tunnel] surgery….While that fact would normally weigh in the claimant's favor, it is offset by the fact that the record reflects that the surgery was generally successful in relieving the symptoms.  The overall record also reveals that the treatment has been generally successful in controlling his symptoms.

(Tr. 144).  ALJ Pope's reference to inconsistencies between Plaintiff's allegations of disabling symptoms, and medical records reflecting effective treatment, is supported by substantial evidence.  (*See e.g.,* Tr. 139 citing Tr. 697; Tr. 140 citing Tr. 703 and Tr. 738, reporting knee "better").

ALJ Boylan agreed with ALJ Pope's negative assessment of Plaintiff's credibility prior to December 5, 2011, but found Plaintiff's complaints to be "generally credible"

19

after that date based upon medical evidence of new severe impairments that occurred after December 2011, which provided new support for Plaintiff's complaints.  Like ALJ Pope, ALJ Boylan referenced Plaintiff's lackluster work history.  (Tr. 20).  Plaintiff criticizes the ALJ's references to his work history, on grounds that Plaintiff was self-employed.  He asserts that being self-employed was "more an indication of his tax return status and his intellectual/business limitations" than his ability to work.  (Doc. 22 at 10).  However, it was both permissible and reasonable for both ALJs to consider Plaintiff's work history, including his unwillingness to look for any other work, as weighing against the credibility of his allegations that he could perform no work at all.  Likewise, it was entirely reasonable to consider that most of Plaintiff's impairments (including all of those listed on Plaintiff's initial disability applications) have existed Plaintiff's entire life but did not prevent him from working prior to his alleged disability onset date.

Both ALJs also briefly referenced Plaintiff's daily activities.  Plaintiff lives in a 2-story house with his wife and 16 year old son; his wife apparently works full-time during the day.  Plaintiff makes simple meals, watches TV, drives three to four times per week, goes out to eat two to three times per week, and is able to independently attend to all personal care.  (Tr. 20, 134).  He visits with his brother and his mother every couple of months.

The remainder of Plaintiff's credibility arguments generally assert that Plaintiff's testimony concerning his allegedly disabling limitations was "consistent with" the record.  However, more than one reasonable inference can be drawn from the record.  Because both ALJs made reasoned and reasonable adverse credibility decisions supported by

substantial evidence, despite Plaintiff's insistence that substantial evidence exists to support a more favorable determination, the credibility assessment should be affirmed.

### 4. Selection of December 5, 2011 as Date of Disability Onset

Plaintiff's final claim is that ALJ Boylan erred in determining that Plaintiff became disabled on or about December 5, 2011, rather than on an earlier date. As stated, the Appeals Council remanded in order for the ALJ to review new and material evidence relating to Plaintiff's March 2012 knee surgery. ALJ Boylan explained his selection of the disability onset date of December 5, 2011 based upon a wealth of other new evidence pertaining to musculoskeletal and breathing impairments that first presented themselves after December 2011:

> There is considerable evidence of new impairments since December 5, 2011…. The claimant has continued to have significant stability problems with his left knee after developing a medial meniscus tear, reporting that he requires constant use of a cane for ambulation and that he fell more than 15 times between mid-2012 and early 2013…. There is additionally evidence of a left rotator cuff for which the claimant underwent surgical repair on May 2, 2012…. MRI imaging from early 2013 additionally documented mild disc bulging in the claimant's spine L4-5 and C5-6, which has led to the claimant undergoing a number of epidural steroid injections. A podiatrist also recommended surgery for the claimant's left foot after a March 2013 MRI showed a seismoid fracture and an osteochondral defect, which were not present on a number of prior radiological studies of the claimant's left foot…. Clinical findings also demonstrate that the claimant experiences limitations from these new impairments, as physicians have observed an antalgic gait, decreased reflexes in his extremities, decreased sensation in his left lower extremity below the knee, crepitation in his knee, diminished strength in his left upper and lower extremity, and diminished ranges of motion in the claimant's left shoulder and knees….
>
> In addition to the claimant's new musculoskeletal issues, there are a number of new respiratory issues that further support limiting the claimant to sedentary work with additional environmental restrictions…. There was an incident in September 2012 where the claimant began reporting breathing difficulties…. While all cardiac tests returned negative at the time, a subsequent pulmonary function test indicated the claimant had high hemoglobin and some evidence of asthma…. Then a subsequent sleep study in December 2012 documented that the claimant had

> moderate obstructive sleep apnea with episodes of hypoxia…. A hematologist later identified this as the likely cause of the claimant's polycythemia, for which the hematologist prescribed…regular oxygen use…. The claimant has since continued to report worsening breathing difficulty and frequent use of a rescue inhaler….although [a physician] also noted that the claimant's obesity, deconditioning, and his decision to quit taking a daily asthma medication largely contributed to his shortness of breath….

(Tr. 23-24).  ALJ Boylan gave "some weight" to the opinions of examining consultant Dr. Phillip Swedberg, whose report was dated June 20, 2013.  (Tr. 24).

In explaining his selection of the disability onset date of December 5, 2011, ALJ Boylan noted that the meniscus tear was not documented until March 5, 2012, when Duane Marchyn, M.D., performed an examination that showed left medial tenderness and a positive McMurray's test.   (Tr. 878-880).  Dr. Marchyn promptly scheduled surgery on March 14, 2012.  The ALJ reasonably concluded that Plaintiff's meniscal tear began, at most, three months earlier, on December 5, 2011.   During Dr. Welsh's examinations on two dates in 2011 and on January 2012, Plaintiff's knee was found to be stable in all places, with no meniscal signs, and no evidence of tenderness.  (Tr. 21, n. 4, citing Tr. 732, 738, 847).  A December 2010 MRI also confirmed the lack of any meniscal tear, despite mild chondromalacia in the patella and mild soft tissue edema.  (Tr. 21, n. 4, citing Tr. 729).  In February 2012, Dr. Welsh first noted some mild knee effusion and a slightly diminished range of motion in the knee, plus an antalgic gait favoring the left side.  (*Id.*, citing Tr. 847).

In support of an earlier date, Plaintiff relies primarily upon the May 28, 2010 Basic Medical form completed by consulting examiner David Provaznik, D.O., for the Ohio Department of Job & Family Services, in which Dr. Provaznik noted "possible reflex sympathetic dystrophy" ("RSD") syndrome based upon Plaintiff's reported history of his [left] foot being crushed at age 10. (Tr. 471-472).  Citing "limited ROM L/S," Dr.

Provaznik opined that Plaintiff could stand/walk for only four hours, although his ability to sit was unlimited.  Dr. Provaznik's stated exertional restrictions would have limited Plaintiff to less than a full range of light work, due to additional postural and other non-exertional limitations. (Tr. 473). However, Dr. Provaznik's limitations were not necessarily work-preclusive, and the ALJ appropriately gave many of his opinions "little weight" in some respects, as "not supported by any objective or clinical findings," with "some weight" given to the opinions that were supported with "objective findings from the consultative examination." (Tr. 142).[8]

Still, relying upon Dr. Provaznik's reference to "possible" RSD, Plaintiff asserts that the symptoms of RSD are "very much like fibromyalgia." Plaintiff also emphasizes an August 2, 2010 report from Dr. Welsh, which refers to "chronic progressive pain" that Plaintiff rated as "5/10" before significant treatment. (Tr. 522-523).  Plaintiff reported difficulty sitting or standing more than 15 minutes and difficulty walking, with pain primarily in his right thigh and left foot.  (*Id.*)  Dr. Welsh suggested "he may have fibromyalgia syndrome" as well as carpal tunnel syndrome.  (Tr. 523, emphasis added).

Plaintiff relies on other selected records to support a general argument that his fibromyalgia and carpal tunnel syndrome support an earlier disability onset date.  (*See, e.g.*, Tr. 521, "tight tender nodules throughout the spine and extremities"; Tr. 531-532, PT records dated 9/22/10 reflecting "diagnoses"[9] of chronic fatigue syndrome, lumbago, and cervicalgia; Tr. 466, 6/30/10 reported feeling depressed without anxiety to Dr. Virgil;

---

[8]ALJ Pope noted that Dr. Provaznik's opinions were given some weight to the extent that evidence supported limitations due to Plaintiff's obesity. Plaintiff is morbidly obese at 288 pounds, *see* Tr. 1152. In his reply memorandum, Plaintiff attempts to raise a new argument relating to the consideration of obesity. (*See, e.g.*, Doc. 22 at 13).  The undersigned finds it inappropriate to consider any argument presented for the first time in a reply memorandum, but alternatively, discerns no error in the ALJ's analysis of the issue.

[9]A PT is not an acceptable medical source.  The source of the reported diagnoses is unclear.

Tr. 478, Dr. Carver's 7/30/10 diagnoses of major depression and generalized anxiety disorder). Plaintiff points to an April 15, 2011 record in which Dr. Welsh states that "[f]rankly, this looks like fibromyalgia and he is on appropriate medication." (Tr. 732). Plaintiff cites footnotes 9 and 10 to SSR 12-2p to argue that all of his earlier documented symptoms could be considered in the nature of a disabling level of fibromyalgia prior to his formal diagnosis, since they appear on a list of "somatic symptoms" that can be used to make that diagnosis. *Id.*

Last, and somewhat oddly, Plaintiff cites Dr. Swedberg's June 20, 2013 examination and opinions to support his claim of disability prior to December 5, 2011. Plaintiff unpersuasively argues that because Dr. Swedberg did not specify the time frame to which his opinions pertain, this Court should simply assume that the opinions relate back to a period *years* earlier (November 1, 2009 through December 5, 2011). However, the report is clearly based upon Dr. Swedberg's assessment in June 2013; it states that Plaintiff was referred for an orthopedic examination and focuses on Plaintiff's knee impairment, assessing the extent of impairment that remained following his 2012 surgical repair. Plaintiff baldy asserts that Dr. Swedberg's opinions were "not inconsistent with" the earlier (wholly unsupported) opinions of Dr. Arrick. Plaintiff offers no legal basis for his "relation back" argument, presumably because none exists.

The undersigned finds no reversible error in ALJ Boylan's choice of a disability onset date of December 5, 2011. Both ALJs considered all of the evidence on which Plaintiff relies, including symptoms that may or may not have been related to his eventual diagnosis of fibromyalgia. However, both ALJs also reasonably determined that Plaintiff was not disabled from that condition or from any other severe impairment prior to December 2011. ALJ Boylan's determination that Plaintiff did not become

24

disabled until he experienced new and additional severe musculoskeletal and breathing impairments after December 2011 is supported by substantial evidence.   In addition to the knee impairment, which was evidenced by a dramatic increase in symptoms beginning mid-2012, Plaintiff suffered a rotator cuff tear (May 2012), newly documented degenerative disc disease in 2013 that was not apparent on earlier studies, and a newly documented foot fracture (March 2013), also not present on prior radiological studies. Beginning in September 2012 Plaintiff began to experience breathing problems and was diagnosed with asthma – yet another new severe impairment that was not present before December 2011.

In his reply memorandum, Plaintiff expands upon an argument that because Plaintiff turned 50 on April 7, 2012 - an age is highly significant for purposes of Grid Rule 201.11 - the ALJ should have assumed disability more than six months earlier, at some point in time prior to Plaintiff's date last insured ("DLI") of September 30, 2011. Plaintiff relies on an example listed under the referenced Grid Rule that suggests that when a claimant's age falls within two months of age 50 and the rule would otherwise apply, the case should be considered "borderline." The example does not mandate an earlier disability date, even if the facts were identical.  Here, Plaintiff did not attain the age of 50 until more than six months after his insured status expired.  Ironically, the ALJ's determination that he became disabled on December 5, 2011, months before the date on which Plaintiff turned 50, already reflects a generous application of the referenced Grid Rule.

### III. Conclusion and Recommendation

For the reasons explained herein, **IT IS RECOMMENDED THAT** Defendant's decision be **AFFIRMED** as supported by substantial evidence, and that this case be **CLOSED.**


         */s Stephanie K. Bowman*
         Stephanie K. Bowman
         United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

TODD E. DUNN,                                    Case No. 1:15-cv-176

        Plaintiff,                              Barrett, J.
                                                 Bowman, M.J.
   v.


COMMISSIONER OF SOCIAL SECURITY,

        Defendant.


**NOTICE**

Pursuant to Fed. R. Civ. P 72(b), any party may serve and file specific, written objections to this Report and Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R. That period may be extended further by the Court on timely motion by either side for an extension of time. All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).